IN THE UNITED STATES COURT FOR THE DISTRICT OF UTAH

NORTHERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>    Plaintiff,<br><br>vs.<br><br>LUIS ESTRADA, MIGUEL MEDINA-PENA, and LORETO AISPURO,<br><br>    Defendants. | MEMORANDUM DECISION AND ORDER ON DEFENDANTS' MOTIONS TO SUPPRESS<br><br>Case No. 1:11-CR-101 TS |

This matter is before the Court on Defendant Luis Estrada's Motion to Suppress Evidence and Defendant Loreto Aispuro's Motion to Suppress Evidence and Motion to Suppress for Miranda Violation. The Court has heard both testimony and oral argument on this matter and, for the reasons set forth below, will grant Defendant Estrada's Motion and deny Defendant Aispuro's Motions.

I. BACKGROUND

In June 2011, the Weber Morgan Narcotics Task Force received information from a confidential informant ("the CI") regarding drug activity that was taking place in Weber and Davis Counties. The CI informed Detective Kasey Burrell that she had been getting methamphetamine from a group of individuals for several years, typically receiving a pound of methamphetamine per week. She also told him how the drug transaction with the individuals would occur, how much she was charged per pound, and which other individuals they were

delivering to. Finally, she told the officers that the individuals stayed in the La Quinta Inn in Layton and drove a black car with a secret compartment.

The CI also gave Detective Burrell the name of other individuals she had dealt with regarding the distribution of controlled substances and provided information regarding two recent arrestees that Detective Burrell was familiar with, corroborating the information she gave about Defendants. In exchange for the CI's help with this case, Detective Burrell agreed to help her with a DUI charge and with another charge against one of her family members.

To begin the operation, the CI called one of the individuals she had been dealing with, who she knew as "Miguel," to arrange a delivery of narcotics. She also told Miguel that she could introduce him to someone who could sell large quantities of methamphetamine. Detective Burrell was with the CI at this time and overheard the conversation.

On June 15, 2011, the CI called Detective Burrell and told him that Miguel had called her and that they were close to arriving. Detective Burrell then picked up the CI, took her to the Layton La Quinta Inn—the hotel where the CI said that Miguel and those he worked with stayed—and there saw three Hispanic males exiting a black car carrying gym bags. The CI recognized two of these individuals and identified one of them as Miguel. Detective Burrell informed other agents that the suspects were at the hotel and established surveillance.

The CI then called Miguel to arrange the drug transaction, again stating that she was going to introduce him to a new buyer. The CI and Miguel agreed to meet at the CI's apartment in Ogden, which is a 20-30 minute drive from the hotel. Approximately one hour later, Miguel Medina-Pena and Luis Estrada drove the same black car towards the CI's apartment in Ogden. They were followed by a number of agents, who stopped them soon after they exited the freeway. After the officers activated their emergency lights, the suspects' vehicle "initially

braked and looked like it was going to pull over, but then it just continued to drive slowly," driving a few blocks before turning into a parking lot.[1]

Officers approached the vehicle and Sergeant Nate Hutchinson spoke with Defendant Aispuro. Sgt. Hutchinson asked Aispuro questions about where he was from and where they were going. Aispuro stated that he was from Arizona, was staying at the La Quinta Inn, and was visiting a friend in the area. However, he also stated that he did not know the name of the friend they were visiting and provided conflicting answers about exactly whose friend it was. Sgt. Hutchinson then asked if there was anything of concern in the vehicle, to which Aispuro said no. Aispuro then stated that the officers could search the vehicle.

Another officer, Officer Grogan, then deployed his narcotic-detecting dog. The dog indicated drugs were present in the vehicle and Sgt. Hutchinson handcuffed Aispuro. Sgt. Hutchinson explained that Aispuro "wasn't under arrest, but he was being detained while [the officers] investigated what the dog told [them] was drugs in the vehicle."[2] Sgt. Hutchinson also advised Aispuro of his Miranda rights at that time.

Multiple agents proceeded to search the vehicle for about 20 minutes, although no narcotics were found. Detective Burrell then returned from dropping the CI off at her apartment. After waiving their Miranda rights, the suspects told him that they were staying in room 316 of La Quinta Inn and consented to a search of the room.

Detective Burrell and Sgt. Hutchinson discussed whether they should first obtain a search warrant to search the hotel room or whether they should secure the room and then seek a search warrant. The officers stated that they were concerned that the suspects may have contacted the

---

[1] Docket No. 86, at 110-11.

[2] *Id.* at 115.

3

third suspect by telephone after the officers turned on their lights but before the suspects pulled over. However, the officers had checked Medina-Pena's cell phone and found that no calls or texts originated from or were sent by the phone during the period in question. Detective Burrell also testified that he knew he needed a search warrant to search the room even though he had been given consent and that the suspects had informed him that another individual was in the room.

The officers decided to attempt to enter and secure the room before seeking a search warrant. They drove to the La Quinta Inn and confirmed with a hotel employee that the key card they had been given by the suspects was to room 316, and went up to the room.

At the room, the officers attempted to open the door with the key card they had been given. They struggled with the key card reader and, after several unsuccessful attempts, they heard an individual say something in Spanish inside the room. The officers, while covering the peephole, identified themselves as police and told the occupant to open the door. At this point, the officers testified that they heard what they interpreted as the deadbolt locking and footsteps of someone running inside the room. In response, the officers broke down the door with their shoulders and found Defendant Luis Estrada running towards them with methamphetamine in his hands. The officers detained Estrada, an officer was posted outside the room, and Detective Burrell prepared and sent a search warrant to a judge. The judge electronically signed the warrant and sent it back 1.5–2 hours later. At this point, Detective Burrell notified Sgt. Hutchinson that the signed warrant had arrived and Sgt. Hutchinson assigned officers to search the room.

Detective Burrell stated that his purpose in entering the room was to secure the individual in the room, remove him from the room, and then write the search warrant. Following the search

of the room, Sgt. Hutchinson told Defendant Aispuro about what the officers had found in the hotel room. Aispuro then told Sgt. Hutchinson that he had observed Defendant Medina-Pena place approximately a half pound of methamphetamine in a hidden compartment under the passenger seat of the car. With this information, Sgt. Hutchinson was able to locate the vehicle's well-hidden compartment, where he found a package containing methamphetamine.

## II. DEFENDANT ESTRADA

Defendant Estrada argues that "the government cannot meet its burden of proving that the police legally entered [his] hotel room to conduct a warrantless search" and the Court should therefore suppress the evidence illegally obtained from that search.[3] For the reasons set forth below, the Court will grant this Motion.

A. LEGAL STANDARD

It is a basic principle of Fourth Amendment law that searches and seizures conducted inside a home without a warrant are presumptively unreasonable.[4] A guest in a hotel room is entitled to the same constitutional protection.[5] However, because "[t]he ultimate touchstone of the Fourth Amendment is 'reasonableness,'"[6] "the warrant requirement is subject to certain reasonable exceptions."[7] "One well-recognized exception applies when 'the exigencies of the

---

[3] Docket No. 90, at 1, 14.

[4] *Payton v. New York*, 445 U.S. 573, 586 (1980) (internal quotation marks omitted).

[5] *Stoner v. State of Cal.*, 376 U.S. 483, 490 (1964).

[6] *Brigham City v. Stuart*, 547 U.S. 398, 403 (2006).

[7] *Kentucky v. King*, 131 S. Ct. 1849, 1856 (2011).

5

situation make the needs of law enforcement so compelling that [a] warrantless search is objectively reasonable under the Fourth Amendment.'"[8]

The United States Supreme Court has identified "several exigencies that may justify a warrantless search of a home."[9] One of these circumstances is "the need to prevent the imminent destruction of evidence," which "has long been recognized as a sufficient justification for a warrantless search."[10]

The Tenth Circuit has held that "[w]arrantless entries justified on this basis must be":[11]

> (1) pursuant to clear evidence of probable cause, (2) available only for serious crimes and in circumstances where the destruction of the evidence is likely, (3) limited in scope to the minimum intrusion necessary to prevent the destruction of evidence, and (4) supported by clearly defined indicators of exigency that are not subject to police manipulation or abuse.[12]

"Accordingly, the test in this circuit requires probable cause and exigent circumstances."[13] The Tenth Circuit has also clarified that probable cause to search requires "a fair probability that contraband or evidence of a crime will be found in a particular place."[14] "Where, as here, probable cause is based on an informant's tip, the court makes a probable cause determination based on the totality of the circumstances, including the informant's veracity,

---

[8] *Id.* (quoting *Mincey v. Arizona*, 437 U.S. 385, 394 (1978)).

[9] *King*, 131 S. Ct. at 1856 (listing examples).

[10] *Id.* (citing *Brigham City*, 547 U.S. at 403).

[11] *United States v. Hendrix*, 664 F.3d 1334, 1338 (10th Cir. 2011).

[12] *Id.* (quoting *United States v. Aquino*, 836 F.2d 1268, 1272 (10th Cir. 1988)).

[13] *Aquino*, 836 F.2d at 1272.

[14] *Hendrix*, 664 F.3d at 1338 (quoting *United States v. Cooper*, 654 F.3d 1104, 1124 (10th Cir. 2011)).

reliability, and basis of knowledge."[15] "An informant's tip which provides 'highly specific or personal details from which one could reasonably infer that the informant had firsthand knowledge about the claimed criminal activity' is more likely to be found sufficient to support probable cause."[16] "When determining whether exigent circumstances existed, we evaluate the circumstances as they would have appeared to prudent, cautious, and trained officers."[17]

The fourth factor touches on an "exception to the exigent circumstances rule, the so-called 'police-created exigency' doctrine," developed by lower courts.[18] "Under this doctrine, police may not rely on the need to prevent destruction of evidence when that exigency was 'created' or 'manufactured' by the conduct of the police."[19]

The United States Supreme Court recently clarified the police-created exigency doctrine in *Kentucky v. King*. The Court stated that police are not required to "seek a search warrant as soon as the bare minimum of evidence needed to establish probable cause is acquired,"[20] as this "imposes a duty that is nowhere to be found in the Constitution."[21] Similarly, the Court rejected tests that subjectively look at the officers' motivations in conducting the search, the probability of creating exigent circumstances through the investigative tactics chosen, or if the officers'

---

[15] *Id.* (citing *Illinois v. Gates*, 462 U.S. 213, 230–31 (1983)).

[16] *Id.* (quoting *United States v. Quezada–Enriquez*, 567 F.3d 1228, 1233 (10th Cir. 2009)).

[17] *United States v. Creighton*, 639 F.3d 1281, 1288 (10th Cir. 2011).

[18] *King*, 131 S. Ct. at 1857.

[19] *Id.*

[20] *Id*. at 1860.

[21] *Id.* at 1861.

investigation was "contrary to standard or good law enforcement practices."[22] The Court also rejected the argument that the officers create an exigency by knocking forcefully and announcing their presence loudly, as 1) there are a number of good reasons for officers to do so and 2) if such a test were adopted, "it would be extremely difficult for police officers to know how forcefully they may knock on a door without running afoul of the police-created exigency rule."[23] The Court then concluded that "the exigent circumstances rule applies when the police do not gain entry to premises by means of an actual or threatened violation of the Fourth Amendment."[24]

B. ANALYSIS

Defendant Estrada argues that the police were unjustified in entering Defendant Estrada's room without a warrant because they lacked probable cause and because there were no exigent circumstances.[25] The government contends that the officers' actions constituted a seizure rather than a search, and should therefore be subject to a different degree of scrutiny. The Court will address each argument in turn.

1. Probable cause

Defendant Estrada first argues that the government cannot show probable cause for the warrantless entry "because all of the evidence available to the police indicated that the drugs were located in the secret compartment in the car."[26] Defendant argues that the CI's history with

---

[22] *Id.* at 1859-61.

[23] *Id.* at 1861.

[24] *Id.* at 1862.

[25] Defendant Estrada has not argued that this was not a serious crime or that the warrantless entry was excessive in scope. Therefore, the Court will not engage in an analysis of these factors.

[26] Docket No. 90, at 14.

Defendants pointed to the presence of drugs in the car's secret compartment rather than the hotel room, as Defendants always drove to meet the CI in the same black car with a secret compartment and the CI provided no information relating to the drugs being stored in the hotel room rather than the car. Finally, once the stop occurred, Defendants Aispuro and Medina-Pena did not say anything about drugs being at the hotel and the drug dog alerted to the presence of drugs in the car.

The government responds by arguing that there was probable cause to search the hotel room, as the CI indicated that two Hispanic males would be delivering methamphetamine to the Ogden area, giving specific details about the vehicle they drove and that they habitually stayed at the La Quinta Inn in Layton. Detective Burrell witnessed these individuals pull up to the hotel and the CI confirmed that they were the individuals she had dealt with in the past. Once the stop occurred, the occupants provided conflicting information about who they were going to visit and where the individual they were visiting lived. A drug dog then indicated that there were narcotics in the vehicle, but officers were unable to find any drugs. The occupants then stated that they were staying in room 316 at La Quinta Inn and provided a key card, which the hotel desk clerk confirmed was for room 316.

"Probable cause to search a person's residence does not arise based solely upon probable cause that the person is guilty of a crime. Instead, there must be additional evidence linking the person's home to the suspected criminal activity."[27] Defendant Estrada argues that such evidence is not present in the case at hand, as all transactions with the CI involved Defendants' vehicle. However, the CI also indicated that the Defendants consistently stayed at the La Quinta Inn in Layton, which is where Detective Burrell saw the Defendants unload duffel bags, where

---

[27] *United States v. Rowland*, 145 F.3d 1194, 1204 (10th Cir. 1998).

9

Defendants Aispuro and Medina-Pena indicated they were staying, and where the room key that they gave the officers originated. Furthermore, the CI indicated that Defendants deliver drugs to other individuals in the area when they are in town.[28] Finally, Defendants had just left the La Quinta Inn when they went to meet the CI and soon before the police dog indicated that there were drugs in the vehicle. This evidence, combined with the corroborating information given by the CI which spoke to her reliability, is sufficient to provide "a fair probability that contraband or evidence of a crime will be found in [room 316 of La Quinta Inn]."[29] Therefore, the Court finds that the officers had probable cause to search the room.

2. Seizure vs. search

The government argues that, as the officer's intent was merely to secure the hotel room, remove any occupants, and obtain a search warrant, "their activity in entering the room should be considered a more limited intrusion than would be a warrantless search, and therefore subject to a different degree of scrutiny."[30] In support of this contention, the government cites to the plurality opinion in *United States v. Segura*,[31] which states:

> [A] seizure affects only possessory interests, not privacy interests. Therefore, the heightened protection we accord privacy interests is simply not implicated where a seizure of premises, not a search, is at issue. We hold, therefore, that securing a dwelling, on the basis of probable cause, to prevent the destruction or removal of evidence while a search warrant is being sought is not itself an unreasonable seizure of either the dwelling or its contents.[32]

---

[28] Docket No. 86, at 13.

[29] *Hendrix*, 664 F.3d at 1338 (quoting *Cooper*, 654 F.3d at 1124).

[30] Docket No. 92, at 15.

[31] 468 U.S. 796, 810 (1984).

[32] *Id.*

10

However, this language comes from a section of the *Segura* opinion that was joined by only two justices. Furthermore, even if the language cited by the government garnered majority support, the same section of the opinion states that the justices did not believe that the holding would increase the possibility of illegal entries by police officers because: 1) "an entry in the absence of exigent circumstances is illegal;"[33] 2) "officers who have probable cause and who are in the process of obtaining a warrant have no reason to enter the premises before the warrant issues, absent exigent circumstances which, of course, would justify the entry;"[34] and 3) "officers who enter illegally will recognize that whatever evidence they discover as a direct result of the entry may be suppressed."[35]

In the case at hand, the officers' did not enter the premises "while a search warrant [was] being sought;" instead, they entered the premises before seeking the warrant, and included substantial evidence found in the apartment in the subsequently-prepared warrant affidavit.

Under the *Segura* plurality, an entry in the absence of exigent circumstances is illegal and evidence discovered from such a search may be suppressed. Therefore, the question before the Court remains the same: whether exigent circumstances existed to justify the officers' warrantless entry.

3. Exigency

Even if the officers had probable cause to search the room, for their warrantless entry to be reasonable, the government still must show exigency. Defendant argues that the government cannot meet this burden because "no evidence suggested that anyone in the hotel room had any

---

[33] *Id.* at 811-12.

[34] *Id.*

[35] *Id.*

11

reason to destroy evidence."[36] Specifically, he argues that there was no reason for the officers to believe that the destruction of evidence was imminent, as a review of the Defendants' phone indicated that they had not communicated with anyone else once the traffic stop began.

The Government responds by arguing that, although a review of the cell phone did not show any outgoing or incoming communications during the time in question, the officers were still concerned that the vehicle occupants may have alerted the third suspect in the hotel room about the traffic stop. The government further argues that what the officers believed to be the sound of the deadbolt locking and footsteps from someone running inside the room after the officers knocked and announced themselves are further indicia of the likely destruction of evidence. The government argues that the facts here are similar to the facts of *Kentucky v. King*, wherein the Supreme Court found that the that police officers' knocking and announcing did not make a subsequent exigent circumstance a police-created exigency, reasoning that where "the police did not create the exigency by engaging or threatening to engage in conduct that violates the Fourth Amendment, warrantless entry to prevent the destruction of evidence is reasonable and thus allowed."[37]

However, in reality, *King* directly forecloses the argument that the sounds heard by the officers' in this case after they announced their presence justified a warrantless entry under the exigent circumstances doctrine. Here, the officers "threaten[ed] to engage in conduct that violates the Fourth Amendment"[38] when they attempted to enter the room with the key card.

---

[36] Docket No. 90, at 14.

[37] *King*, 131 S. Ct. at 1862.

[38] *Id.*

Therefore, any destruction of evidence demonstrated by the deadbolt locking and running sounds inside the room was the result of police created exigency and cannot be considered by the Court.

Because any indicators of exigency that arose after the police attempted to enter the room were police created, the remaining question before the Court is whether there were already "clearly defined indicators of exigency"[39] prior to the officers' attempted entry. As 1) the officers found from a review of the vehicle occupants' phone that the vehicle occupants had not contacted Defendant Estrada and 2) there was no evidence presented regarding any other clearly defined indicators of exigency, the Court finds that no exigency existed prior to the officers' attempted entry. The Court will therefore grant Defendant Estrada's Motion and suppress the evidence found in Room 316.

## III. DEFENDANT AISPURO

Defendant Aispuro initially filed both a Motion to Suppress Evidence and a Motion to Suppress for Miranda Violation with the Court. After the evidentiary hearing, Defendant Aispuro filed his Memorandum in Support, arguing that 1) the officers unconstitutionally extended the scope of the investigatory stop and 2) the officers lacked probable cause to arrest Mr. Aispuro, and that therefore all evidence and statements should be suppressed as "fruit of the poisonous tree."

A.  LEGAL STANDARD

It is undisputed that the initial traffic stop was justified by traffic violations that the police observed. Defendant therefore argues that the scope of this detention was unconstitutionally extended. "The stopping of a vehicle and the detention of its occupants constitute a "seizure" within the meaning of the Fourth Amendment. An ordinary traffic stop is a limited seizure,

---

[39] *Hendrix*, 664 F.3d at 1338 (quoting *Aquino*, 836 F.2d at 1272).

however, and is more like an investigative detention than a custodial arrest."[40] A determination of the limits of police conduct in such circumstances hinges on "whether the officer's action was justified at its inception, and whether it was reasonably related in scope to the circumstances which justified the interference in the first place."[41] When determining reasonableness, the officers' conduct is to be viewed "with 'common sense' considering 'ordinary human experience.'"[42]

> An investigative detention usually must last no longer than necessary to effectuate the purpose of the stop. An investigative detention may be expanded beyond its original purpose, however, if during the initial stop the detaining officer acquires reasonable suspicion, of criminal activity, that is to say the officer must acquire a particularized and objective basis for suspecting the particular person stopped of criminal activity.[43]

B.   ANALYSIS

Defendant Aispuro first challenges the reliability of the CI. As stated previously, 1) the CI provided information corroborating her knowledge of the matter, 2) had accurately described the suspects and their vehicle, and 3) the suspects further supported the CI's information when, soon after their conversation with the CI, they left the hotel and drove towards the designated meeting place. This information, along with the evasive and unclear answers provided by Defendants Medina-Pena and Aispuro regarding who they were visiting, gave the officers "a particularized and objective basis for suspecting the particular person stopped of criminal

---

[40] *United States v. Walker*, 933 F.2d 812, 815 (10th Cir. 1991) (citation omitted).

[41] *United States v. Dewitt*, 946 F.2d 1497, 1501 (10th Cir. 1991) (quoting *Terry v. Ohio*, 392 U.S. 1, 20 (1968)).

[42] *United States v. Villa-Chaparro*, 115 F.3d 797, 801 (10th Cir. 1997) (quoting *United States v. Sharpe*, 470 U.S. 675, 685 (1985)).

[43] *Id.* (internal quotation marks and citations omitted).

activity."[44] Therefore, the Court finds that the delay in the stop necessary for the drug dog to investigate was reasonable.

Defendant next challenges the reliability of the drug dog, arguing that the government has provided "no information whatsoever about the reliability of the k-9 who indicated on the vehicle or what kind of certainty, if any, can be assigned to a k-9 hit."[45] The Tenth Circuit has stated that "a dog alert usually is at least as reliable as many other sources of probable cause and is certainly reliable enough to create a 'fair probability' that there is contraband. We therefore have held in several cases that a dog alert without more gave probable cause for searches and seizures."[46] However, the Tenth Circuit has also stated that "it surely goes without saying that a drug dog's alert establishes probable cause only if that dog is reliable."[47] Reliability has been established in previous cases by providing the dog's accuracy records or certification.[48]

At the evidentiary hearing, the government submitted into evidence the affidavit for search warrant. This affidavit describes the drug dog's training, reliability, and certification.[49] Defendant Aispuro has not challenged the veracity this information and the Court finds the dog alert to be reliable based on the information provided.

---

[44] *Id.*

[45] Docket No. 91, at 5.

[46] *United States v. Ludwig*, 10 F.3d 1523, 1527 (10th Cir. 1993).

[47] *United States v. Ludwig*, 641 F.3d 1243, 1251 (10th Cir. 2011) *cert. denied*, 132 S. Ct. 306, 181 L. Ed. 2d 187 (2011).

[48] *See, e.g., United States v. Parada*, 577 F.3d 1275, 1283 (10th Cir. 2009); *Ludwig*, 641 F.3d at 1251.

[49] Evidentiary Hearing Exhibit 1, at 4.

Therefore, the evidence before the Court supporting the detention of Defendants Medina-Pena and Aispuro prior to the search of the hotel room consists of: the information provided by the CI, which was corroborated by the Defendants' actions; the time taken by Defendants to pull over after during the stop; the unclear answers provided by Defendants regarding who they were visiting; and the drug dog's indication on their car.  The Court finds this to be sufficient evidence to constitute probable cause to detain Defendant Aispuro while a warrant was sought and the hotel was searched.  Therefore, the Court will deny Defendant Aispuro's Motion to Suppress Evidence.

The government presented testimony that Defendant Aispuro was given *Miranda* warnings multiple times over the course of the evening.  This testimony was uncontroverted, and Defendant Aispuro has not argued that a *Miranda* violation occurred in the memorandum in support of his Motion to Suppress or at oral argument.  Therefore, the Court will deny Defendant Aispuro's Motion to Suppress for *Miranda* Violation.

## IV. CONCLUSION

Based on the forgoing, it is therefore

ORDERED that Defendant Estrada's Motion to Suppress Evidence (Docket No. 49) is GRANTED.  It is further

ORDERED that Defendant Aispuro's Motion to Suppress Evidence (Docket No. 56) is DENIED.  It is further

ORDERED that Defendant Aispuro's Motion to Suppress for *Miranda* Violation (Docket No. 57) is DENIED.

The time between the filing of Defendants' Motions and the date of this Order is hereby excluded for purposes of Speedy Trial Act calculation under 18 U.S.C. §§ 3161 (h)(1)(D), (H).

DATED June 21, 2012.

BY THE COURT:

_____
TED STEWART
United States District Judge